# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> ROBERT LEE KANTARIS, <br><br> Defendant. | No. 16-CR-3024-CJW-MAR <br><br> **MEMORANDUM OPINION AND ORDER** |

## I.  INTRODUCTION

This matter is before the Court on defendant's Motion for Compassionate Release filed on June 4, 2020.  (Docs. 44 & 45).  On June 9, 2020, the government timely filed a brief in resistance.  (Doc. 46).  On June 15, 2020, defendant timely filed a reply.  (Doc. 49).  Oral argument was not requested and is not necessary.  *See* LR 7(c).  For the following reasons, the Court **denies** defendant's motion.

## II.  RELEVANT BACKGROUND

From December 17, 2012, through January 22, 2016, officers received information that defendant was distributing methamphetamine from his residence in Mason City, Iowa.  (Doc. 25, at 3).  Officers also learned that defendant used his employment as a truck driver to import methamphetamine into Mason City.  (*Id.*).  On January 8 and 21, 2016, defendant sold methamphetamine to a confidential informant in his home.  (*Id.*, at 4).  On January 22, 2016, officers executed a search warrant at defendant's residence and discovered five plastic baggies of methamphetamine, a digital scale, several glass methamphetamine pipes, several small empty plastic baggies, three police scanners, five security cameras, viewing monitors, handgun ammunition, a

handgun magazine, and a total of $1,866 in cash. (*Id.*, at 6). Defendant ultimately stipulated that he was responsible for intentionally distributing more than 75 grams of actual (pure) methamphetamine. (*Id.*, at 3, 6).

On July 20, 2016, a grand jury issued an Indictment charging defendant with one count of conspiracy to distribute a controlled substance in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846 ("Count 1"), one count of distribution of a controlled substance in violation of Sections 841(a)(1) and 841(b)(1)(B), and one count of possession with intent to distribute a controlled substance in violation of Sections 841(a)(1) and 841(b)(1)(A). (Doc. 1). On August 2, 2016, officers arrested defendant. (Doc. 6). On August 3, 2016, defendant pleaded not guilty and was detained pending trial. (Doc. 9). On September 19, 2016, defendant changed his plea to guilty on Count 1 pursuant to a plea agreement with the government. (Docs. 16–1 & 18). On October 4, 2016, the Court accepted defendant's plea. (Doc. 21).

On December 6, 2016, the United States Probation Office ("USPO") filed defendant's final presentence investigation report ("PSR"). (Doc. 25). Defendant was, at that time, 59 years old and residing in Mason City, Iowa, where he was also born. (*Id.*, at 2, 15). Defendant was raised in an apparently stable home and graduated from high school. (*Id.*, at 2, 15–16). His employment history was inconsistent. (*Id.*, at 21–22). While married from 1976 to 1989, defendant had two sons, one of whom passed away in 2010. (*Id.*, at 16). During a subsequent relationship, defendant had a third son. (*Id.*).

Defendant's health problems include psoriasis, colonic diverticulosis, and multiple surgeries for hernia repairs and a bicep tendon repair. (*Id.*, at 16, 19). In late January 2016, defendant was hospitalized after he smoked methamphetamine and got into a snowmobile accident. (*Id.*, at 16). Defendant had several fractured ribs, contusions, a punctured lung, a sprained knee, and a "disfigured" hand. (*Id.*). In late April 2016,

defendant was diagnosed with right chronic subdural hematoma with brain compression and midline shift. (*Id.*, at 18). Defendant reported he had undetected brain bleeding from his earlier snowmobile accident which required surgery. (*Id.*). In May 2016, defendant was prescribed medication for his persisting headaches and weakness. (*Id.*). In August 2016, while incarcerated, defendant was diagnosed with headaches and a non-traumatic intracerebral hemorrhage. (*Id.*). Defendant recently reported shooting pains in his leg and neck, pain in his right temple, spotted vision, and an enlarged prostate. (*Id.*, at 19).

Defendant has long shown symptoms of anxiety and depression. (*Id.*). Defendant had a long history of alcohol, marijuana, cocaine, and methamphetamine abuse, notably using methamphetamine daily from 2010 to July 2016. (*Id.*, at 20). Defendant had participated in multiple drug treatment programs and successfully completed two. (*Id.*, at 20–21).

Defendant's criminal history began at age 35 and contained convictions for disorderly conduct, three thefts, three domestic abuse assaults, an additional assault against a former girlfriend, attempted burglary, criminal mischief, trespass, interference with official acts, and violation of a no contact order. (*Id.*, at 10–14). Defendant violated his probation on multiple occasions for, among other things, violating a no contact order twice, testing positive for methamphetamine multiple times, failing to maintain employment, failing to meet with his probation officer, engaging in new criminal conduct, and failing to make payments toward court-ordered obligations. (*Id.*, at 11–13).

On January 4, 2017, the Court sentenced defendant. (Doc. 33). Defendant was in criminal history category III with a total offense level of 27, yielding an advisory guideline range of imprisonment of 87 to 108 months followed by at least five years on supervised release. (Doc. 25, at 25–26). This offense was subject to a mandatory

minimum sentence of 120 months imprisonment. (*Id.*, at 25). The Court sentenced defendant to 120 months' imprisonment followed by five years on supervised release as well as a fine of $10,000. (Doc. 34). Defendant is currently incarcerated at FCI Forrest City Low ("FCL") with a projected release date of February 7, 2025. (Doc. 45, at 2).

### III. *COMPASSIONATE RELEASE STANDARDS*

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the United States Sentencing Guidelines ("USSG") discussing compassionate release. *See* USSG §1B1.13; *see also United States*

4

*v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

### IV.    DISCUSSION

#### A.    *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) states the court may reduce a defendant's term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has held defendants are not

5

required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

On March 30, 2020, defendant submitted his request for release to FCL's warden. (Doc. 45-1, at 3–5). On April 29, 2020, the warden denied his request. (*Id.*, at 1–2). It appears defendant did not appeal the warden's denial. On May 18, 2020, defendant filed a pro se motion for compassionate release in this Court. (Doc. 40). After the Court appointed defendant counsel (Doc. 41), defendant filed his Motion for Compassionate Release now before the Court on June 4, 2020 (Doc. 44). Because 30 days have now elapsed since defendant submitted his request to the warden, the Court finds defendant has fulfilled the exhaustion requirement of Section 3582(c)(1)(A).

### B. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his medical conditions put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 45, at 6–11). Defendant cites his age of 62 and diagnoses of hyperlipidemia, hypertension, gastroesophageal reflux disease ("GERD"), psoriasis, and major depressive disorder.[1] (*Id.*, at 7). The government argues defendant's health conditions are insufficient. (Doc. 46, at 3–11). Particularly disputed is the extent to which the Court should consider the extensive outbreak of COVID-19 at

---

[1] Defendant's pro se motion for compassionate release also mentions a prior heart attack, his brain bleeding in 2016, his broken ribs and punctured lung in 2016, a history of lung infections, and a chronic cough. (Doc. 40, at 2–3). His current motion for release does not mention these conditions. These conditions are not discussed in his BOP records either. As to his lungs, the only statement in the record is that they sound clear. (Doc. 45-2, at 95). Defendant noted a recurring cough in June 2018 but has since denied having a cough. (*Id.*, at 14, 69, 116–18). Thus, although the Court notes some of these conditions occurred in the past, they do not appear to be concerning presently.

6

FCL. Currently, there are 30 inmates and one staff person with active cases of COVID-19 at FCL. *COVID-19*, BOP, https://www.bop.gov/coronavirus/. More than 660 inmates and three staff have recovered from COVID-19. *Id*.

Numerous courts have held a defendant's relevant health conditions and the presence of COVID-19 within the BOP generally, or within the defendant's specific facility, together can constitute an extraordinary and compelling reason for compassionate release. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases). The Centers for Disease Control ("CDC") lists nine categories of people who are at higher risk of severe illness and death from COVID-19: (1) people 65 years or older, (2) people living in a long-term care facility, (3) people with chronic lung disease or moderate to severe asthma, (4) people with a serious heart condition, (5) people with a compromised immune system, (6) severely obese people with a body mass index ("BMI") of 40 or above, (7) diabetic people, (8) people with chronic kidney disease undergoing dialysis, and (9) people with liver disease. *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The latter seven categories apply to "[p]eople of all ages with underlying conditions, particularly if not well controlled[.]" *Id*.

Defendant's major depressive disorder, GERD, and psoriasis do not implicate any of the CDC's elevated risk categories.[2] *See, e.g.*, *United States v. Daza-Cortez*, No.

---

[2] Major depressive disorder is, as it sounds, "a common but serious mood disorder." *Depression*, National Institute of Mental Health, https://www.nimh.nih.gov-/health/topics/depression/index.shtml. Psoriasis is a common, long-term skin condition which causes red, itchy, scaly patches in various places. *Psoriasis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/psoriasis/symptoms-causes/syc-20355-840. GERD "is a digestive disorder that occurs when acidic stomach juices, or food and fluids back up from the stomach into the esophagus." *Gastroesophageal Reflux Disease (GERD)*, American Academy of Allergy, Asthma & Immunology, https://www.-aaaai.org/conditions-and-treatments/related-conditions/gastroesophageal-reflux-disease#:~:text=Gastroesophageal%20-Reflux%20Disease%20(GERD)%20is,higher%20risk%20of%20developing%20GERD.

7

2:15-cr-00269-RAJ, 2020 WL 3451959, at *5–6 (W.D. Wash. June 24, 2020) (holding the defendant's depression, GERD, and colitis were not the type of chronic conditions warranting release); *United States v. Delgado*, No. 3:18-cr-17-(VAB)-1, 2020 WL 2464685, at *4 (D. Conn. Apr. 30, 2020) (noting the defendant's obesity and sleep apnea were relevant to COVID-19 but his psoriasis was not); *United States v. Davis*, No. 17-CR-615 (JMA), 2020 U.S. Dist. LEXIS 71963, at *3 (E.D.N.Y. Apr. 23, 2020) ("Defendant has not explained how GERD specifically presents a heightened risk for contracting COVID-19 or experiencing more severe health complications if COVID-19 is contracted."). Although the Court acknowledges that mental health concerns may compound a defendant's physical ailments, *see* (Doc. 49, at 2), mental health alone is not the type of condition which itself increases an inmate's susceptibility to COVID-19. It is notable that defendant is prescribed Betamethasone, an immunosuppressant, for his psoriasis in the form of a topical cream for use on his scalp and in his beard. (Doc. 45–2, at 3, 45 68, 181). Some courts have found "severe forms of psoriasis requiring immunosuppressive therapies" may put an inmate at greater risk because such immunosuppressants lower the body's ability to combat infections. *United States v. Robinson*, No. 18-cr-00597-RS-1, 2020 WL 1982872, at *2 (N.D. Cal. Apr. 27, 2020) (noting psoriasis alone is generally not a risk factor but that the defendant's psoriasis was so severe that he was a mortality risk even before the COVID-19 pandemic arose); *see also United States v. Chappell*, No. 16-CR-512-LTS, 2020 WL 3415229, at *1 (S.D.N.Y. June 22, 2020) (noting the defendant was being treated for "advanced psoriasis" with immunosuppressive therapies). The record never describes defendant's psoriasis as severe or advanced, but it does note he uses Betamethasone and another steroid cream in small amounts and a special shampoo for it. (*Id.*, at 119, 181–82). Although these treatments are significant, they are only topical. Because he is not using Betamethasone orally or intravenously, it appears it would have little to no impact on his

immune system.  *See If You Are Immunocompromised, Protect Yourself from COVID-19*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/needextraprecautions/immuno-compromised.html (noting corticosteroids and immunosuppressants inhibit the body's immune system when used orally or intravenously); Conforti, et al., *COVID-19 and Psoriasis: Is It Time to Limit Treatment with Immunosuppressants? A Call for Action*, Dermatology Therapy, https://onlinelibrary.wiley.com-/doi/full/10.1111/dth.13298 (March 2020) (suggesting "topical and/or drugs with a lower impact on the immune system" should be preferred over immunosuppressant drugs amid the pandemic).  Thus, the Court notes these conditions and treatments but affords them little weight.

Although defendant will soon be 63 years old, he does not meet the CDC's risk category for persons over age 65.  The only potential risk category defendant meets is for persons with a serious heart condition due to his hyperlipidemia and hypertension.  His hyperlipidemia is described only as being "controlled with [medication]" and having "no side effects."  (Doc. 45–2, at 68) (capitalized in original).  Defendant also takes medication for his hypertension.  (*Id.*, at 3).  Defendant's last significant complaint about his hypertension was on June 25, 2018.  (*Id.*, at 119).  His cardiovascular health overall, even noting his hyperlipidemia and hypertension, was described on May 28, 2019, as being within normal limits and having regular rate and rhythm.  (*Id.*, at 69–70).  In sum, although defendant has cardiovascular health issues, the record does not reflect such issues are serious.  Thus, it does not appear defendant falls within any of the CDC's risk categories.

The Court must also evaluate to what extent defendant is at risk of exposure to COVID-19 at FCL, which is undoubtedly a viral hot spot among BOP facilities.  Although the BOP and CDC are now implementing even greater measures to stymie the spread of the virus, the sheer numbers out of FCL are alarming, particularly for a facility of only around 2,000 inmates.  *See FCI Forrest City Low*, BOP, https://www.bop.gov-

9

/locations/institutions/for/. Although the number of active cases at FCL is now falling dramatically, *see* (Doc. 49, at 1), the data shows inmates at FCL have a significant probability of being exposed to COVID-19. If defendant had serious medical conditions in his record which significantly increased his risk of serious complications or death, the Court would be concerned for his safety at FCL. Defendant, however, does not have such conditions. Despite defendant's risk of exposure being higher than inmates at other facilities, his corresponding risk of severe consequences is low.

Thus, the Court finds defendant has not presented an extraordinary and compelling reason for release and **denies** his motion on this basis. In the alternative, the Court will independently discuss the Section 3553(a) factors as if defendant had presented an extraordinary and compelling reason for release.

### C. *Section 3553(a) Factors and Danger to Community*

Guideline Section 1B1.13(2) provides compassionate release is appropriate only where "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

The 3553(a) factors are mixed but weigh against release. For approximately three years at least, defendant used his employment as a truck driver to import and sell

10

methamphetamine in Mason City. Defendant's residence was outfitted with a significant amount of equipment to avoid or deter detection, such as cameras, monitors, and police scanners. It appears, however, that defendant was only a minor distributor. Although a magazine and some ammunition were discovered at his home, there is no evidence he used a firearm while dealing in controlled substances. His employment history is spotty. Defendant used multiple controlled substances for years, methamphetamine daily. Defendant continued to use methamphetamine despite completing two drug treatment programs and getting into a snowmobile accident as a result of his drug abuse. Nothing in his background explains or mitigates his substance abuse issues. Defendant's criminal conduct has only escalated since 1992. Although he has no prior drug offenses, he did violate the terms of his probation on multiple occasions for using methamphetamine. Notably, defendant has had no disciplinary reports while in prison and has instead taken classes and worked. (Docs. 40, at 4; 45–3; 45–4). He also has a stable residence to go to when released. (Doc. 45–5). Defendant is approximately four years into his term of incarceration and, after accounting for good time credit earned, still has approximately four years to go. (Doc. 45, at 12). Given the nature of his offense and his personal characteristics, even when considering the mitigating factors present, a reduction of approximately 50 percent is not warranted. The remainder of defendant's sentence is necessary to deter this defendant and others similarly situated as well as to justly punish defendant, promote respect for the law, and protect the public.

## V. CONCLUSION

For these reasons, defendant's Motion for Compassionate Release is **denied**. (Doc. 44).[3] Defendant must serve the remainder of his term of incarceration as previously directed. (Doc. 34).

**IT IS SO ORDERED** this 29th day of June, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

---

[3] To the extent defendant's pro se motion for compassionate release (Doc. 40) is not superseded by his current motion (Doc. 44), the Court **denies** it as duplicative.

12

Case 3:16-cr-03024-CJW-MAR   Document 50   Filed 06/29/20   Page 12 of 12